UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAUREN PARENTI,<br><br>　　　　　　　　Plaintiff,<br><br>-against-<br><br>SPECIALIZED BICYCLE COMPONENTS, INC.,<br><br>　　　　　　　　Defendant. | CIVIL ACTION NO.:<br><br><br>DECEMBER 19, 2020 |

**COMPLAINT**

Plaintiff Lauren Parenti, as and for her complaint against the defendant, Specialized

Bicycle Components, Inc. ("Specialized"), alleges as follows:

PRELIMINARY STATEMENT

1.　　　Ms. Parenti worked for Specialized from October 20, 2014 until April 23, 2020,

when her employment was terminated in violation of Title VII of the 1964 Civil Rights Act

("Title VII"), the Connecticut Fair Employment Practices Act ("CtFEPA"), C.S.G.A.§§46a-

60(a)(1), and the California Fair Employment and Housing Act ("CaFEHA", Cal. Gov. Code §

12840. Before she was selected for layoff in April 2020, she endured a hostile work environment

where women were treated as less competent than men and, worse still, as sexual playthings for

upper management. Specialized retaliated against her for opposing sexual harassment by

withholding a bonus she earned, and forced a pay cut upon her that a similarly situated male was

not forced to take. Then, to add insult to injury, Specialized's founder defamed her and her

fellow US-based employees who were laid off by declaring that they were not top talent, were no

longer needed by Specialized, and had to be fired to make room for new people. Not

surprisingly, Ms. Padalino suffered emotional distress as a result of Specialized's actions.

PARTIES

2.      Lauren Parenti is a resident of the State of Connecticut and resides in New Preston, Connecticut. From October 2014 to December 2019, Ms. Parenti lived and worked for Specialized in California. In December 2019, Ms. Parenti returned to her home state of Connecticut and continued working for Specialized from Connecticut.

3.      Defendant Specialized is a corporation organized under the laws of the state of California. It is authorized to do business in the State of Connecticut.

PROCEDURAL PREREQUISITES

4.      On September 1, 2020, Plaintiff filed a "dual charge" of discrimination against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC").

5.      On September 21, 2020, Plaintiff received a Notice of Right to Sue letter from the EEOC regarding charge number 523-2020-02041. (*See* Exhibit A.)

6.      On December 16, 2020, Plaintiff received Releases of Jurisdiction from the CHRO for the Defendant regarding Complaint number 2130115. (*See* Exhibit B.)

7.      On December 18, 2020, Plaintiff filed a complaint against Defendant with the California Department of Fair Employment and Housing ("DFEH") On December 18, 2020, Plaintiff received a Right to Sue notice from the DFEH regarding case number 202012-12129818. (*See* Exhibit C.)

JURISDICTION AND VENUE

8.      Plaintiff's claims pursuant to Title VII raise questions of federal law. This Court has jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction of the Plaintiff's remaining claims, which arise from the same case or

controversy, pursuant to 28 U.S.C. § 1367(a).

9.      The District of Connecticut is the appropriate venue for this matter. Plaintiff

resides in Connecticut and worked in Connecticut when her employment was terminated.

Defendant is authorized to do business in Connecticut and is, therefore, amenable to the personal

jurisdiction of courts in the state of Connecticut.

## STATEMENT OF FACTS

10.     Lauren Parenti worked for Specialized from October 24, 2014 to April 23, 2020,

during which she was intentionally and willfully discriminated against in the terms, conditions

and privileges of her employment substantially because of her gender. She endured six years in a

work environment that was hostile to women, she was denied compensation and perquisites

because of her gender, her salary was decreased when the salaries of similarly situated men were

not, and her employment was terminated due to gender-based animus. Specialized maintains and

propagates a pattern and practice of concerted gender discrimination against similarly situated

female employees. Defendant purportedly maintains an equal employment opportunity policy

that has a disproportionate negative and adverse impact upon female employees, including Ms.

Parenti.

11.     Specialized adopted a Code of Conduct to guide its own actions and those of its

suppliers. Concerning employment, the Code of Conduct states:

> NONDISCRIMINATION
>
> No person shall be subject to any discrimination in employment,
> including hiring, compensation, advancement, discipline,
> termination or retirement, on the basis of gender, race, religion,
> age, disability, sexual orientation, nationality, political opinion,
> social group, or ethnic origin

HARASSMENT OR ABUSE

Every employee shall be treated with respect and dignity. No
employee shall be subject to any physical, sexual, psychological,
or verbal harassment or abuse.

https://www.specialized.com/us/en/code-of-conduct, last accessed
August 3, 2020.

10.     Specialized did not practice what it preached. The company treated female

employees as if it were the 1950s – women were not allowed to work on men's products for the

first few years Ms. Parenti worked there, women's contributions and achievements were ignored

or undermined, and the company hewed to paleolithic views of working mothers.

11.     In fact, Specialized's "Mother's Room" – the space set aside for working mothers

to express breast milk for their infant children – encapsulates Specialized's attitude toward

working mothers. It was a small, dark closet in the maintenance department – roughly an 8-

minute walk from Ms. Parenti's work area. It had no lock, no sink in which to clean the parts of

her breast pump, and no refrigerator in which to store the expressed milk. Between travel time,

pumping, clean up, and storage, each of Ms. Parenti's pumping session took about 45 minutes.

The time delay in her production ability caused her a great deal of stress. She felt like she was

doing something wrong or jeopardizing her job having to run from meeting to meeting trying to

pump, clean, and store. After several weeks, she learned from the head of maintenance that they

had no idea anyone actually used the "Mother's Room" for its intended purpose, and that he

would have to tell his staff to stop using it as a napping room.

12.     Similarly, Specialized likes to say that it supports working mothers, and set aside

a Mother's Room as proof. But like the Mother's Room, Specialized makes it very clear that

working mothers are not welcome in its ranks by putting up barriers – both physical and

organizational – to success working at Specialized after having a child. Specialized's lack of

interest in accommodating working mothers is highlighted by its causing a task (like pumping one's breasts) that could take as little as 20 minutes, and exploding it to a 45-minute ordeal that is inconvenient both to the women and those with whom the women work. The paucity of women who successfully integrated back to Specialized after having a child is underscored by the surprise of the head of maintenance that any working mother wanted to use the man's nap room.

13.     Ms. Parenti does not recall whether Specialized included any anti-discrimination or anti-harassment provisions in its employee handbook but, in any event, it is not something Specialized took seriously until recently. In the time since Ms. Parenti left Specialized, it hired its first Chief of Diversity. Her first order of business: surveying Specialized's employees to determine if they are satisfied with how they are treated. Not surprisingly, few employees believe they are treated as equal to their peers.

Working with Ron Jones at Cycling Sports Group, Inc.

14.     Ron Jones was Ms. Parenti's manager at Specialized when her employment was terminated, but she knew him before she started working at Specialized. Years earlier, he and she both worked at Cycling Sports Group, Inc. ("CSG"), in Wilton, Connecticut. Mr. Jones was not her manager at CSG.

15.     After her interview at CSG, Ms. Parenti had an appointment with her hairdresser, who was also a childhood friend. Coincidentally, Mr. Jones was a client of the same hairdresser. The hairdresser reported that Mr. Jones came in for a haircut after interviewing Ms. Parenti. Mr. Jones mentioned Ms. Parenti, noting that the other interviewers (six male and female) wanted to hire her but he did not because her hair was too big and she wore too much perfume. Mr. Jones' opinion as to matters unrelated to her skills, knowledge, and abilities notwithstanding, Ms.

Parenti was offered the position, and she resolved to demonstrate that she was talented and not just a pile of hair. For the entire time they both worked at CSG, every time Mr. Jones went for a haircut, he would brag that he was going to get his cheap thrills from her childhood friend, saying, "She rubs her breasts in her face through the whole haircut." Ms. Parenti felt bad that her friend had to deal with people like this, and she felt uncomfortable with his blatant objectification of women.

16.     At CSG, Ms. Parenti was originally responsible for all Color and Graphics development of Schwinn bicycles sold in the Independent Bicycle Dealer channel. From there, she took over management of Color and Graphics for Cannondale women's bicycles. After Ron Jones left CSG, she was responsible for Color and Graphics for all Cannondale bicycles.

17.     Eventually, her boss at CSG – a woman with more than 11 years of industry experience – was promoted to be Mr. Jones' manager. Mr. Jones did not react well to having a woman in charge of him. Ms. Parenti witnessed him refusing to listen to her, arguing, and complaining through every meeting. He even claimed she stole his Cannondale ideas to use on GT brand products.

18.     While working at CSG, Ms. Parenti met her life partner, Jimmy Browning, who was also a graphic designer at CSG. They have been together for eight years.

19.     When she first started working for CSG, Ms. Parenti earned $37,000 per year. It was not enough to make ends meet, so she also worked in a local restaurant. Mr. Jones set out to ensure that Ms. Parenti's pay was adjusted so she would not have to moonlight.

20.     Mr. Jones was a senior designer and Ms. Parenti interpreted his support to mean that she had proven herself talented and he was taking her under his wing. Sometime later, she learned his true motivation was much less honorable: Mr. Jones was being nice to curry sexual

favors from Ms. Parenti. Specifically, he told Mr. Browning (before they started dating) that he

was going to sleep with Ms. Parenti on a work trip. That did not happen, and soon thereafter Mr.

Jones began gossiping that Ms. Parenti thought she was "too good" for him and other coworkers

because she refused to go swimming with them while traveling; i.e., she refused to strip down to

a swimsuit for his enjoyment. Mr. Jones did not limit his inappropriate comments to third parties.

He also commented on her physical appearance, telling her things like her eyeliner was "too

dramatic."

21.     Mr. Jones eventually left Cannondale. Ms. Parenti understands that the situation

leading to his departure was not positive and resulted from complaints by men and women on his

team. This was an open secret in the industry. In fact, Mr. Jones and his hiring manager at

Specialized, Design Director Alain Lanusse, told Mr. Jones that they heard he was "an asshole."

Lanusse hired him nevertheless, and the two joked for years about how Mr. Jones was an

asshole.

Ms. Parenti and Mr. Browning Move to California to Work for Specialized

22.     Specialized hired both Ms. Parenti and Mr. Browning, together, as graphic

designers. They moved from Connecticut to California for the positions. Ms. Parenti welcomed

the new, exciting challenge to focus on developing women's products for an industry leading

brand.

23.     On her first day of work, Specialized had an "on-boarding" meeting with Ms.

Parenti. It lasted no more than an hour, and she was at her desk by 9:30-10:00 am. She was given

several documents to read and sign, and a binder of employee policies to read and acknowledge.

One of the documents was an "Arbitration Agreement." (*See* Exhibit D.)

24.     The Arbitration Agreement does not contain a valid waiver of jury trial, or any

language waiving the right to trial by jury. The only mention of jury trials is buried in the ninth line of the third paragraph, about two-thirds of the way down the page of a dense, single-spaced document. The sentence, which comes 10 lines of type before the parties' signatures, merely describes arbitration as "an alternative to a jury trial or court action…" It is in the same typeface and font size as the rest of the document.

25.     Ms. Parenti had no opportunity to negotiate the terms of this agreement. It was among the documents she had to sign to start working at the job she moved cross-country to take. She was not given the opportunity to discuss it with an attorney.

26.     Ms. Parenti did not sign the Arbitration Agreement voluntarily. She did not intend to waive her right to trial by jury. She did not want to waive her right to trial by jury, and did not think she had done so.

27.     Ms. Parenti's first role within Specialized was leader/manager of the women's bicycle graphic design team. She managed two graphic designers and they were responsible for developing the look and feel for all bicycles in Specialized's line of women's products to help create the most competitive, cohesive product and color stories. The company's goal was to bring more women to cycling.

28.     Graphic design for bicycles involves learning about the product and accenting its physical features with appropriate design elements to convey a message or resolve a problem. It can involve creation of decals, paint, typography, texture, and patterns, as well as choosing materials and finishes, deciding how dominant the element should be, and making the business case for each design choice. Ms. Parenti earned a bachelor's degree in Visual Communication, where she learned everything about design and concept development. Her education and her five years at CSG qualified her to be a Graphic Designer at Specialized, with a team to manage.

29.     Design creation itself is only part of the job. Selecting color is critical. Color can be tied to 90% of product sales. Getting color wrong can kill a product. Developing color stories is not as simple as picking colors you like and that look good together. It involves intensive research to predict the colors that will appeal to consumers two to three years in the future, when the products become available for purchase. Ms. Parenti's inspiration for color palettes came from researching economic and social trends – everything from politics to the automotive and fashion industries. She has studied color and subscribed to numerous trend forecasting sites like World's Global Style Network and Pantone, and look into recommendations and forecasts from leading coatings companies like Viavi and PPG. Through her experiences and education, she learned how to forecast future trends.

30.     Every October, Specialized held a "line planning meeting," where the global market leaders would validate the future product lines before Specialized brought them to market. The leaders reviewed all the products and decided whether to sell them in their markets. If they decided to sell the products, they had to decide how many the market could support and select color options. If a product was dubbed "unsellable," the designers would have to create new concepts/designs to satisfy market needs.

31.     Before she started working for Specialized, the women's team demonstrated a need for a women's version of the Stumpjumper (aka "Stumpy") mountain bike, but the team could not get the project passed until meeting with global markets for discussion and validation. On her first day of work at Specialized, the women's mountain bike, called "Rhyme," was approved at the line planning meeting. Ms. Parenti was assigned the graphic design for Rhyme. She had three days to develop the concept, color, and get approval from her manager and product management in order to catch up to the timeline to bring Rhyme to market.

32.     Ms. Parenti's design was incredibly well-received. Michael Sinyard, Specialized's Chairman and Founder, congratulated her on a job well done. Rhyme was selling out and male journalists covering the launch of Stumpy and Rhyme, along with retailers and cyclists in the industry, were asking product managers and sales teams for a men's bike with the graphic styling she created for Rhyme. Her manager, Alain Lanusse, did not acknowledge Ms. Parenti's work or tell her she did a good job until after the Product Manager sent an email on April 2, 2015, lauding her design. He wrote:

> Hey Guys, During the launch, Brandon and I have been talking about how great the Rhyme graphics are, and how dated the Stumpy graphics look.
>
> Some of the journalists have even commented on how they'd like to have the women's graphic even. I know this is a bit hectic, but we'd like to explore a new graphic for [S]tumpy in something with nice color blocking like the direction you're heading in with [a different product]. Think we could pull this off?

33.     The popularity of her design for Rhyme forced a redesign of the graphics for Stumpy. This caused a few bruised egos because the reviews for Rhyme were overwhelmingly positive and Stumpy paled in comparison. Plus, Specialized never had men's and women's bikes share graphics originally developed for a women's product. Mr. Lanusse did not let Ms. Parenti work on the Stumpy version of the Rhyme graphics. Rather, he assigned it to a male mountain bike designer. Mr. Lanusse's sole acknowledgement of her work consisted of an email on April 9, 2015, stating, "Don't let it inflate your head. Good job." Ms. Parenti felt like Specialized wanted her to do great work, as long as she did not show up the boys.

34.     Mr. Browning and she were candid about their relationship during the recruitment process and Specialized hired them together. They had the same details in their contracts and same start date. In their job interviews, Specialized even asked them what would happen if they

broke up. There was no secret that they were a couple, yet Specialized imposed rules on them to minimize their interactions and punish them for working well together. The day they started, their desks were back to back. This fostered collaboration between them.

35.     A few months later, Mr. Lanusse and Specialized's Creative Director Robert Egger pulled them into a meeting to inform them that they would no longer be assigned desks near each other because they were "over collaborating," whatever that means. Ms. Parenti and Mr. Browning were prohibited from having lunch together but conceded that it would be "ok to sometimes get coffee together." They were told not to sit next to each other in meetings. It was humiliating. She and Mr. Browning were being disciplined for collaborating and spending time together, even though Specialized hired them together, knowing they were a couple, and knowing they would be getting the value-add of their close, collaborative relationship.

Pregnancy and Harassment by Mr. Lanusse

36.     Six months after joining Specialized, Ms. Parenti became pregnant. In or about August 2015, she informed Mr. Lanusse (and only Mr. Lanusse) of her pregnancy. She did not expect special treatment because she was pregnant, but Mr. Lanusse apparently did not like that she had chosen to become a mother and went out of his way to make unreasonable demands of her to highlight her few physical limitations resulting from her pregnancy. It was as if, to prove the point that pregnant women did not belong at Specialized, he harassed Ms. Parenti by forcing her into situations where she had to (a) reveal her pregnancy when she preferred not to, and/or (b) refuse his directions because she was a woman and she was pregnant. He apparently resented even more the fact that she returned to work after her son was born, and considered her maternity leave to be some kind of self-indulgent vacation designed to inconvenience him and that she did not deserve.

37.     Shortly after informing him of her pregnancy, Mr. Lanusse assigned Ms. Parenti to attend three business trips, to Portland, Oregon; Whistler, British Columbia; and Friedrichshafen, Germany.

38.     The Portland, Oregon trip occurred in August 2015. She was the only female traveling with three director-level men: Mr. Lanusse, Mr. Egger, and Alfredo Echauri (Director of Maintenance). They arrived at the airport late and, once through security, both Lanusse and Egger started running for the gate. She followed them to the gate, trying to keep up, and hold the plane for Mr Echauri. Mr. Lanusse jumped on the plane saying, "Fuck Mr. Echauri. He will be fine." She and Mr. Egger waited for Mr. Echauri, and he was able to get on the plane.

39.     They arrived at their hotel in downtown Portland at night, after dark. Mr. Lanusse left their rental car by the front doors of the hotel. There was no valet. Mr. Egger checked in and went to his room. The concierge at the desk said the parking lot was a couple blocks away. Mr. Lanusse looked at Ms. Parenti tossed Ms. Parenti the keys and said, "Go park the car." She replied, "It's dark, and I don't want to go alone." She ignored Mr. Lanusse, and told him she would leave the car to get towed. Mr. Echauri seemed embarrassed about Mr. Lanusse's refusal to acknowledge the dangers inherent in sending a lone woman to find a parking lot several blocks away, and then walk back, in the dark, in a strange city. He parked the car for them.

40.     In August 2015, they also traveled to Whistler, British Columbia, for a mountain bike festival. Again, she was the only woman attending from the Specialized Design Department. Even though Mr. Lanusse knew she was pregnant, he insisted that she would have to ride a mountain bike during the trip and made her prepare for riding. He would not accept her refusal to participate. Mr. Lanusse insisted that Ms. Parenti contact the marketing team to get a bicycle and Specialized apparel. Mr. Lanusse would not relent. Having no way to avoid riding while

preserving her privacy, Ms. Parenti had to announce her pregnancy to the team. Mr. Lanusse forced her hand. Mr. Lanusse retaliated against Ms. Parenti by making her work the Specialized booth for the entire festival. On one of the days of the festival, Mr. Lanusse told Ms. Parenti not to call or email him because he "would not be working."

41.     It rained the entire time, so Ms. Parenti rarely strayed from the booth, and spent the entire festival answering questions like a shop girl instead of walking the grounds, spotting trends, and evaluating competitors' offerings. When they returned from the weekend trip, Ms. Parenti requested a couple days off to recover from the festival. Mr. Lanusse refused her request, stating, "That trip is like a vacation." Perhaps it was for him. Ms. Parenti, however, had spent several days on her feet in a sales booth and she needed a break.

42.     The third business trip was to Friedrichshafen, Germany, to attend Eurobike, the largest bike show in the world. It was a research trip, so they did not have to work at a booth. Both she and Mr. Browning attended, along with some other male colleagues. At the end of the show, they drove to meet Mr. Lanusse and the team at Specialized's offices in Switzerland.

43.     The group wanted to ride electric mountain bikes in the Swiss Alps. Mr. Browning was a novice mountain biker and Ms. Parenti was pregnant, so they both expressed a lack of enthusiasm about the idea. Mr. Lanusse, however, kept insisting that she could ride it, as if the issue were her strength as a rider and not her pregnancy. Yet again, Mr. Lanusse put Ms. Parenti in the position where she would have to refuse to participate due to her pregnancy. Seeing how uncomfortable she was, Mr. Browning said, "She isn't going. It is not safe for a pregnant woman" to ride mountain bikes in the Alps. Mr. Lanusse's harassment forced a public announcement of her pregnancy. All the guys left Ms. Parenti at the office with a bicycle to ride into town while they "shredded."

Sexism and Harassing Ms. Parenti's Direct Reports

44.     Mr. Lanusse's sexism and harassment was not reserved for Ms. Parenti. Her two

team members, Mavis Sizto and Ivee Isidro, were both Asian immigrants who spoke accented

English. In communications about her team's annual reviews, he noted that their English was

poor, and required Ms. Sizto to take presentation classes. He called Ms. Isidro "soft" when she

was out sick, saying she should "muscle up." His comments were petty and had nothing to do

with the criteria on which their work was being evaluated.

45.     At the 2015 Color Tour in Chicago, they spent the day prior to our big

presentation setting up. That night, Mr. Lanusse wanted to go out to dinner and drinking with the

team. Ms. Parenti was pregnant at the time, but had not told anyone yet so she discreetly

abstained from drinking alcoholic beverages. Mr. Lanusse led the team, including Ms. Parenti's

direct reports, in drinking and carousing. Ms. Sizto, who is an Asian woman with a very slight

build and weighed less than 100 lbs, encouraged by Mr. Lanusse, tried to keep up drinking with

him. Given her size, it was not surprising that she ended up getting so sick she vomited in the

garbage bin at the bar, in front of everyone. Ms. Parenti helped her back to her room to clean up

and get to bed. When she got back to the bar, Mr. Lanusse was laughing about it to our

colleagues. The next day, he told Ms. Parenti that Ms. Sizto "better perform today."

46.     When the team returned to California, Mr. Lanusse told Ms. Parenti it was

inappropriate for Ms. Sizto to have overindulged in alcoholic beverages at a company outing. He

instructed Ms. Parenti to call Ms. Sizto into a meeting with the Mr. Lanusse and Ms. Parenti, so

he could reprimand Ms. Sizto for her actions. He told her that her behavior was inappropriate and

it would not be tolerated again. Ms. Parenti thought Mr. Lanusse was being cruel. Ms. Sizto did

have to temper her behavior in the future, but Mr. Lanusse goaded her into overindulging and

chided her for following his lead.

47.     Specialized Human Resources department actively discouraged employees from reporting questionable conduct. For example, when any of Mr. Lanusse's employees complained about him to HR, HR would go directly to him with the complaint. Then, Mr. Lanusse would bully the person by making snide comments to insiders about the situation. For this reasons, Ms. Parenti did not feel safe raising concerns about Mr. Lanusse's harassment. The system felt corrupt and she would suffer worse harassment if she spoke up.

Mr. Lanusse Lays Off Ms. Parenti's Staff While She Was on Maternity Leave

48.     Two days into her maternity leave, Specialized laid off Ms. Parenti's entire team. It is very likely that Mr. Lanusse knew about the layoff before Ms. Parenti's maternity leave began in January 2016, but he waited until she was on leave to inform her about it. Mr. Lanusse called Ms. Parenti at home and asked which of the "girls" she wanted to let go. She said neither; she could not focus on such a critical issue when she was supposed to be preparing to give birth any day, could not manage the work alone, and both women worked late and hard all of the time to meet the company's deadlines. Mr. Lanusse said he would decide. His decision was to lay them both off. This was just more harassment to make it clear that Ms. Parenti, a woman and soon-to-be mother, was not worthy of the respect every male manager at Specialized would receive when it came to decisions about his staff.

49.     With the layoff, the women's product design team was reduced to one person: Ms. Parenti, who was also responsible for developing color strategy for men's products. As she was on maternity leave, Mr. Lanusse hired their intern, Kayla Clarot, as new graphic designer for her group. Ms. Clarot focused on women's design so Ms. Parenti could focus on color strategy exclusively. Mr. Lanusse never explained why he had to lay off both Ms. Isidro and Ms. Sizto

when he could, and did, replace one of them with Ms. Clarot. Just like with the layoffs, she did not have any say in hiring Ms. Clarot for the graphic design position even though every male manager at Specialized would have.

Widespread Hostility Upon Returning to Work

50.     Initially, Ms. Parenti planned to take four months off for her maternity leave. Near the end of that time, she still had not found satisfactory childcare for her son. On April 8, 2016, she sent an email to Mr. Lanusse and her HR Representative Lori Roberts requesting an additional month of leave. She wrote, "The soonest we can get [our son] in daycare is June 1. So, I will have to extend my leave time until then. What are the next steps?" Mr. Lanusse responded, "I approve but I find it hard to believe that with 9 months of pregnancy and 4 months maternity the soonest you can find daycare is June...". Mr. Lanusse's response was shocking and demeaning. He seemed to be accusing Ms. Parenti of laziness or lying. It harkened back to the dark ages when working women were not supposed to be mothers. Or, if they were mothers, it had better not ever interfere with work.

51.     Ms. Parenti concluded that Mr. Lanusse had no experience attempting to secure good infant childcare and had no idea that openings for infants are hard to come by due to minimum infant to employee ratios. Ms. Parenti considered reporting his comment to HR, except HR was already copied on the email. The HR representative called Ms. Parenti to express her shock and said, "I cannot believe he just wrote that." She asked Ms. Parenti if this kind of thing happened regularly and Ms. Parenti responded, "Yes." A few months later the HR representative was laid off.

52.     In May 2016, Ms. Parenti went to the company barbecue to say hi to the team, introduce her son, and express her excitement to get back on board. Mr. Lanusse pretended not to

see her and left the barbecue. This set the stage for their relationship in the next years. Ms. Clarot, by comparison, was so excited to see Ms. Parenti. She begged Ms. Parenti to come back because she was drowning in work, and excited to be on the women's team. She felt oppressed by the overabundance of "bros" and needed another female designer on the team.

53.     When Ms. Parenti returned to work in June 2016, Mr. Lanusse did not greet her or welcome her back. All her teammates said hello, but he sat at his desk and refused to acknowledge her presence. Ms. Parenti sat down at her computer expecting to see a meeting request from him to bring her up-to-speed on the changes and reorganization that happened while she was on leave. There was nothing. After about an hour, Ms. Parenti went to Mr. Lanusse's desk and said, "Hey, I'm back. How is it going? What's going on?" His sharp response was, "Just busy working!" Ms. Parenti asked, "Would you like me to set up some time for you to bring me up to speed?" He replied, "Not sure what we have to catch up about." Ms. Parenti set up the meeting anyway. She had been out of the office for five months and, notwithstanding Mr. Lanusse's petulance, she needed to meet with him to find out his priorities.

54.     In their meeting, Mr. Lanusse tasked Ms. Parenti with creating color direction for Men's and Women's Product before their next milestone, "June Color Tour." Ms. Parenti had two weeks to develop, complete, and ship their presentation. He explained how Ms. Clarot would handle women's product with her oversight, and she could dabble in color while Ms. Parenti made color direction her main focus.

55.     In short, Ms. Parenti went from knowing exactly how her role as women's bicycle graphic design manager worked, to creating a whole new department for color. There was no color person or department before this. Ms. Parenti was excited by the challenge to prove herself and a little nervous about the lack of structure to her role, but there was an opportunity here to

create a foundation. Ms. Parenti finished the June Color Tour presentation on time and had it ready for a meeting to which she was not invited, even though she was in charge of color for Specialized.

56.     Ms. Parenti was disappointed by how Mr. Lanusse treated her after she returned from maternity leave. He made her feel ashamed that she took time away from work to have a child and start a family. He made her feel that she chose between her career and having a family, and not only had she chosen poorly but her career could no longer progress. It was like some corporate Madonna-Whore Dichotomy: in Mr. Lanusse's world a woman could have a career or be a mother, but not both at the same time. This mindset, she soon learned, was shared by many at Specialized.

57.     In or about September 2016, about three months after she returned from maternity leave, she was walking to a conference room in her department just as a meeting with Mr. Lanusse and some men from the marketing department was breaking up. Ms. Parenti reached the door just as they were walking out. The men were laughing aloud as one of the men from marketing stated that once women come back to work after maternity leave, "they just aren't focused on their job like they used to be." When he saw Ms. Parenti, he quickly added, "Oh! Sorry, Lauren, but you know what I mean. How can you be?" Ms. Parenti was humiliated by their casual sexism and the laughing assent by the men assembled. Ms. Parenti had been working harder since she returned to work, taking on the challenge of developing the graphics and color palette for men's products with a smaller staff than before she had her son, when she worked on women's products only. Ms. Parenti's manager and the marketing department men did not see her contributions, only their tired gender stereotypes.

58.     Unfortunately, the women's product team was dissolved again shortly after she

returned from maternity leave. Specialized would no longer manufacture or sell bicycles engineered specifically for women. The women's products would be the same as the men's products, but would be smaller with some variety in color and graphics. Ms. Parenti believes the women's team was dissolved because the audacious goal of 25% growth set by Mr. Sinyard was not met in the one-year timeframe he allotted. After the change, she became the only member of the Color Department and Ms. Clarot continued with product design. Instead of focusing on products specifically for women, they developed global graphic and color stories for Specialized's entire product range (men's and women's bicycles, helmets, shoes, apparel, and accessories). This marked the first time Specialized permitted women to design men's products.

Tired Marketing Tropes, Undermining, and Taking Credit for Women's Work

59.     Mr. Jones started working for Specialized around 2013, after he left Cycling Sports Group. He started as Road Graphics Manager and grew to become Production Manager with direct reports in Asia, and Morgan Hill, CA. In or around 2016, Mr. Jones relocated back to Connecticut. In October 2018, he was promoted to Design Manager and became Ms. Parenti's manager for the first time. Mr. Jones' overt sexism was not "on hold" when Mr. Lanusse was in charge. Rather, the men were cut from the same cloth: they undervalued and undermined the performance of female designers, assigned credit to men for the work performed by women, and cleaved to sexist marketing tropes from the last century.

60.     In early 2018, Ms. Parenti and Mr. Lanusse attended their teams' performance evaluation meeting with upper management. Mr. Lanusse reported giving Mr. Jones a high score because he developed a reflective paint. In reality, Mr. Browning and Ms. Clarot developed the "reflective paint;" Mr. Jones insisted that the reflective paint was not possible. Mr. Browning and Ms. Clarot even made an instructional video for the paint they developed to teach the factories

how to apply it. When she corrected Mr. Lanusse's inaccurate statement, he insisted that it was

not true. In retaliation, Ms. Parenti was never invited to another manager's performance review

meeting. Not only had she corrected Mr. Lanusse before upper management, but she gave credit

to her partner-in-breeding and a female.

61.     In 2017, after Specialized stopped making bikes engineered for women, Mr.

Lanusse gave Ms. Clarot only one design project: creating a unisex, futuristic design for both

men and women for Tarmac, a premium road/race bike. This was the first time a woman worked

on design for a men's bike, so Ms. Clarot was meticulous, ensuring every element of design was

intentional and perfect – she knew what was at stake. Ms. Clarot's design was well- received and

nearly approved. Mr. Lanusse gave the project to Mr. Jones to "improve" the design for

"production standards." Mr. Jones's "improvements" were minor and the design was approved.

The approvers – product managers, all of whom were male – referred to the final product as

"Ron's new design." Ms. Clarot and Ms. Parenti were very frustrated that Mr. Jones received the

credit for Ms. Clarot's work.

62.     By 2020, Specialized employed only five women on a product team of 50 or

more. Former members of the women's team either resigned or had been laid off. Of the five,

one worked as a product manager for gravel bicycles reporting to a male head of road bicycles,

and four worked on the product graphics reporting to her former colleague at Ron Jones. From

2016 to 2019, Ms. Clarot and she were the only female designers on the Design team. Following

her termination, the number of women on the entire product team dropped down to four.

63.     Ms. Parenti and Ms. Clarot faced constant pushback on their designs based on

outdated gender stereotypes, unavailing stereotypes about Millennial and Gen Z customers, and

Mr. Jones self-proclaimed superior knowledge in all aspects of production. In one example, Ms.

Clarot and she worked on a designs and colors for bicycles that would appeal to both men and women. They thoroughly researched and developed their designs. When they presented their work, it was summarily rejected with comments like, "We don't need multiple graphics on this model level because women will not be purchasing at this price point," and this bicycle is for "old men, doctors, and lawyers." Mr. Jones could not conceive that Specialized did not have to market to Boomer and GenX customers because Specialized already had them. He could not understand that attracting Millennial and GenZ customers required a different approach.

64.     Most frustrating were Mr. Jones's comments. He constantly cut-off Ms. Parenti and Ms. Clarot mid- presentation to impart knowledge like, "You won't be able to do that in production." Mr. Jones never considered that she and Ms. Clarot always conferred with the factories before presenting their ideas to make sure all our designs could be produced. In the process, they learned about decal application and paint. They knew how to push the limits to help Specialized be a leader in graphic innovations. Every presentation that involved Mr. Jones was a struggle because men like Mr. Jones could not give the creative work of women its due respect. If a man did not design it, it was not worthy of consideration.

65.     Before Mr. Jones became her manager at Specialized, he came to dinner at her and Mr. Browning's house. He had recently relocated to Connecticut and he was looking for something to do over a weekend while in California for work. For the most part, they talked about work including his relocation. Outside work, Mr. Browning and she typically call each other by terms of endearment, including "love," as Mr. Browning is British. A few days later at work, as she was leaving a meeting with some of the team, Mr. Lanusse said something to Ms. Parenti – she does not recall what, and it is not relevant. Mr. Jones asked, "Did you just call her 'love'?" Mr. Lanusse vehemently denied it, saying, "What? No. Why would I do that?" Mr.

21

Jones laughed and replied, "I thought it was something you called her at work, because she and [Mr. Browning] call each other those pet names." Ms. Parenti felt embarrassed and betrayed. She and Mr. Browning welcomed Mr. Jones into their home and he used that experience as a sophomoric power move against Mr. Lanusse and to belittle Ms. Parenti.

66.     Ms. Parenti and Ms. Clarot were told in their reviews and quite often by their manager Mr. Lanusse that they should share their opinions. When they did, however, their opinions were either denigrated or coopted by a man who was lauded for his creative genius. One afternoon, Ms. Clarot came out of a meeting quite frustrated about decisions that were being made around graphic design. While voicing her frustration, a male co-worker turned to her and said, "Stop complaining, be quiet, sit down, and just do your work." This kind of response was considered acceptable in Specialized; no one said anything to him about the disrespectful manner in which he spoke to Ms. Clarot. Mr. Lanusse would respond to female opinions with, "Do you want to get your bonus? I do. We will make what we know sells."

67.     The behavior of their male colleagues in the United States can be written off as garden variety casual sexism: obnoxious and demoralizing, but it did not leave one wanting a shower. The behavior of Specialized European Market Leaders (all male), however, was downright disgusting. They were never expected to conform with the most basic workplace anti-harassment rules and, in fact, they rarely did. At one meeting, Ermanno Leonardi made a show of looking Ms. Parenti up and down lasciviously, saying "Laurena, you look so good after having the baby, beautiful, beautiful." He then showed her pictures of herself that she did not know existed and which someone had taken surreptitiously. His condescension knew no limits, taking it upon himself to inform Ms. Parenti at a work dinner that she had enough pepper on her meal and it was not good for her.

68.     Mr. Leonardi criticized Ms. Clarot for the size of her foot, saying, "Wow, those are nice shoes do they come in women's sizes too?" At another event, he commented on her decision to wear lipstick, stating, "Now you look like a real woman."

69.     These comments were belittling and demoralizing, and Mr. Leonardi seemed to take particular pleasure in delivering them while they were giving presentations. Ms. Clarot and Ms. Parenti felt powerless to combat this disgusting behavior. These men – and they were all men – lead the markets since the company had been founded. They were in their 60s and made the buying decisions for their markets. They had a great deal of influence over the industry and their direct reports, in particular. Their behavior had been tolerated since the 1970s and, 40+ years later, was not likely to change.

70.     The overt sexism and micro-aggressions were not the exclusive domain of Specialized's European Market Leaders. In 2018, Mr. Lanusse had asked Ms. Parenti for her opinion on hiring a female intern that was working with their team. Ms. Parenti recommended against the hire, stating that she regarded the intern as lazy, unmotivated, and not talented in design. While out drinking beers with the men on the production team, Mr. Lanusse said he wanted to hire her "because she had great boobs."

Unequal Perks of the Job.

71.     Product managers and Mr. Lanusse would frequently hand out free products to the men on the team. Often, a fully assembled bicycle would appear at a co-worker's desk for him to "test" (i.e., take home and keep). One time, after completing an electric bike project for BMW, Mr. Lanusse received a fully built BMW Levo, which has a manufacturer's suggested retail price in the U.S. of about $5,900. He gave it to her colleague Joe Lynch, who worked on the project with him. As the men were only ever "testing" the bikes, it is unlikely they were taxed on these

valuable perks.

72.     Neither Ms. Clarot nor Ms. Parenti (nor any other women on the graphics team)

**ever** received free product. They asked Mr. Lanusse about this and his response was always,

"You don't ride." This was untrue. Ms. Parenti and Ms. Clarot certainly did ride bicycles, they

just did not race. When they went for their annual team ride, the men would take off racing as

fast as they could on the roads or trails. It was not much of a team event; it was more of a

manliness competition. Ms. Parenti did not own a mountain bike because Specialized bikes were

too expensive. When you work for a consumer product company, you are expected to show your

loyalty to the product by using it. The women in her department were not given the same chance

to do so as the men.

Specialized Promotes Sexists and Sexism

73.     In 2018, Ms. Clarot walked into the Design Department printer room and found

on the computer screen, and printing out of the vinyl machine, artwork that read "Jumping ruts

and fucking sluts." She brought it to Ms. Parenti's attention immediately. They were both

horrified. They discovered that a co-worker, Kyle Mannschreck, created the artwork during work

hours suggesting rather strongly that the male leadership in the department was complicit. Ms.

Clarot and Ms. Parenti reported the work to a male leader in another department, and he brought

it to the attention of HR. HR made Mr. Mannschreck apologize to Ms. Clarot (and not to Ms.

Parenti).

74.     Mr. Mannschreck's awful judgment did nothing to change his existing plans to

relocate to Taiwan for 12 months, during which he was to build a team to aid in production for

Specialized. The following day, Mr. Mannschreck sent details of his new job to the printer and

left it there for Ms. Parenti and Ms. Clarot to discover. His new job included a raise and a

promotion. Mr. Mannschreck made sure that Ms. Clarot and Ms. Parenti knew that their offense meant nothing to Specialized.

Mr. Jones Becomes Head of Design.

75.     In October 2018, Mr. Lanusse was removed from his role of Design Director and was demoted to Production Manager. Mr. Jones then assumed Mr. Lanusse responsibilities but with the title Head of Design. The Design team was divided into production, graphics, and color. All the designers reported to Mr. Jones and the rest to Mr. Lanusse. Ms. Parenti had her own direct report and they both reported to Mr. Jones. No one asked Ms. Parenti her opinion of working for or with Mr. Jones or Mr. Lanusse before the decision was made.

76.     Mr. Jones worked remotely from his home in Connecticut when he became Head of Design. A few years earlier he had relocated back to Connecticut because, as he intimated to Ms. Parenti and Mr. Browning, his wife was extremely unhappy in California, and wanted to have their first child in Connecticut, where they had the support of friends and family.

77.     Mr. Lanusse was Mr. Jones' manager at the time, and was not interested in having Mr. Jones work remotely. Accordingly, Mr. Lanusse and Creative Director Robert Egger prepared a contract that Mr. Jones would not accept: it cut his salary in half, provided no benefits, and had oppressive noncompete terms. Mr. Jones told Ms. Parenti and Mr. Browning how insulting he found the contract. Mr. Jones also told Slate Olsen, who was Head of Global Marketing. Mr. Olsen went directly to company founder Mike Sinyard, who agreed to the relocation with a compensation adjustment. After his relocation, Mr. Jones intimated to Ms. Parenti and Mr. Browning that his compensation was not changed.

78.     After the changes in the team leadership the atmosphere in the department became thick with animosity. Mr. Lanusse let everyone know how displeased he was by making snide

comments and intentionally undermining the work ethic of the design team. Each day, he commented about Mr. Jones' work and leadership. Mr. Lanusse regularly stated aloud that Mr. Jones did not care about timelines or production ability because his paint specifications were late, extremely expensive, and overly complicated. Mr. Lanusse would tell the designers that they were "behind schedule," or declare in a loud voice that he was "waiting on design work." The designers sat three feet away from his desk. It made for a very toxic and uncomfortable environment.

79.     Mr. Lanusse started scheduling work timelines to demonstrate his own value. He Lanusse invited Ms. Parenti, Mr. Jones, and the design team manager Greg Black, to his first calendar planning meeting to set up initial timelines. Mr. Jones participated by conference call. Mr. Lanusse brought breakfast for himself and Mr. Black, but nothing for Ms. Parenti. She was not invited to any subsequent calendar planning meeting, even though tracking her team's work with color was an important piece of the production schedule. The men told Ms. Parenti that her presence was not necessary.

80.     When Mr. Jones became her manager, she started having weekly one-on-one calls with Mr. Jones. The focus of the calls was usually whatever problems Mr. Jones was having as a manager. In one of their first calls, he told Ms. Parenti that he was responsible for finding a Creative Director. When she asked how the search was going, he informed Ms. Parenti that he "had to look out for [his] best interests and would not be making this search a priority." Ms. Parenti learned the hard way that Mr. Jones made all decisions based on his own best interests, regardless of the interests of Specialized. Whether it was playing petty power games with Mr. Lanusse that also belittled Ms. Parenti, or ensuring her layoff when global leaders started noticing her designs and color stories, Mr. Jones never sought to elevate others when he could

knock them down a peg.

81.     Ms. Parenti was a target for Mr. Jones before he became Head of Design. In August 2018, she was invited by marketing to join the Olympic planning meetings, and tasked with developing a premium, eye catching, innovative colorway for the 2020 Tokyo Olympic product. She prepared and pitched a color story for the brand. Her story was based on the science of color and how it captures the human eye, which she called, "The Speed of Light." The Head of Global Marketing and Global Creative Director for marketing loved the concept. They wanted to plan their entire year of product stories around her concept.

82.     After they finished discussing their marketing plan to have all products go to market with a play on speed or weight, Mr. Jones, who was participating by conference call, argued that her concept was not any good. Mr. Jones claimed that Specialized's consumers did not care for deep concepts but only cared for things they could relate to, such as cars. The Global Creative Director and Global Marketing Director overrode his objections. After the meeting ended, the head of marketing pulled Ms. Parenti aside and said, "That was weird. Does Ron like you? Do you guys get along?" It was very apparent to him, based on Mr. Jones' comments, that something was not right. In subsequent meetings, Mr. Jones continued to oppose to her color concept, sometimes belligerently. After a few weeks, he was disinvited to the meetings, while she continued to attend. For all intents and purposes, that decision by the head of marketing put a target on her back.

83.     Mr. Jones actively undermined Ms. Clarot's designs and her color selections after the Olympic product debacle, heedless of the interest of Specialized. The graphics for the Roubaix line is a perfect example. In 2018, Ms. Clarot designed new graphics for the Roubaix line of racing bikes to appeal to non-racers and women. Ms. Clarot's design was particularly

important because it was intended to attract the female rider who would have purchased a bike from the Ruby line if Specialized still made bikes engineered for women. Her design consisted of clean graphics – two parallel bands to signify gender equality, inspired by the #metoo movement. The existing graphic was a traditional racing graphic with speed lines and paint masking, designed by Mr. Jones.

84.     Ms. Parenti and Ms. Clarot had to fight the product management team to get Ms. Clarot's design into production. At first, the product manager laughed at the design and said, "We are not doing it. It's not necessary." Undeterred, Ms. Parenti and Ms. Clarot gathered all the women cyclists in the company (about 10) and presented them both graphic concepts. They all favored Ms. Clarot's design, and the product manager relented. This was a huge win because the Roubaix was the first bicycle used to merge men's and women's platforms.

85.     Almost as soon as he became Head of Design, Mr. Jones suggested getting rid of Ms. Clarot's design, telling the team, "It wasn't selling." During one of their weekly one-on-one calls in early 2019, Ms. Parenti pushed back on the idea. As it happened, she had just finished a re-color for the upcoming model year for the Roubaix line and in the weeks before that call, several members of the sales team came by to visit our department to see the new colors. They told Ms. Parenti that they wanted to see her work and hear the color stories before making their forecasting decisions. It seems they under-forecasted sales of Ms. Clarot's graphic the previous year and did not want to make that mistake again. They described the design and equality concept as very relatable to the times.

86.     Ms. Parenti explained all this to Mr. Jones and he responded, "It doesn't matter. No one cares about that, especially our consumers." He said consumers only cared about matching their bicycle to their car. Ms. Parenti was gobsmacked. People were marching in the

28

streets for women's rights and the #metoo movement, yet Mr. Jones rejected what the sales team said resonated with their customers.

87.     This was Mr. Jones modus operandi. His design aesthetic resonated with a certain demographic – guys who wanted their racing stripe-laden bikes to match their cars – but Ms. Clarot's design was on most models that sold out that model year. He acted in his self-interest by trying to kill a woman's successful design. Just like the Olympic bike debacle, Mr. Jones' objection was overridden and Ms. Clarot's design continued to be produced notwithstanding Mr. Jones' belief in last century's marketing tropes.

88.     In 2019, Specialized developed the lightest road bicycle in its history. Internally, it was called "Project 300;" the bike has since been launched and is marketed as "Aethos." Ms. Parenti wanted to develop an innovative lightweight paint application for the 300, and spent weeks researching how to simplify the painting process to cut weight. Then the design department received its first frame. It was raw carbon and unfinished, but beautiful. As she stood next to it, Ms. Parenti thought, "Why not raw pigment? No heavy carriers." Ms. Parenti opened a jar of pigment and lightly wiped it onto the frame with her fingers. It was unique and beautiful. They named the process "Color Run."

89.     Ms. Parenti left the frame by Ms. Clarot's desk so she could develop the graphics for it. As people walked through our department, they would stop short on seeing the 300. They were drawn to touch it, asking "What is this? It's beautiful." That was how Ms. Parenti knew they had to produce it.

90.     In March 2020, after she relocated, Ms. Parenti returned to California for a Global Go To Market meeting. They received the first samples of the whole "300" line and as she inspected them, Specialized's Market Director of Spain, Miguel Rojo, said to Ms. Parenti

"Lauren, this is the most beautiful line of bicycles I have seen in our history. I love each one more then the last, I can't even decide on a favorite." It was the best compliment she had received in her 5+ years at Specialized.

91.     As part of the meeting, Specialized runs a tradeshow so the global market leaders can see the future products and learn about what they will be selling. Ms. Parenti saw Mr. Jones walking the floor with Mr. Sinyard. When they were finished, Mr. Jones told Ms. Parenti, Ms. Clarot, and other members of the design team that Mr. Sinyard was very happy, but he especially loved "Color Run." Ms. Parenti was ecstatic. She asked, "Did you tell him I worked on it?" Mr. Jones responded, "No," and walked away. Mr. Jones always looks out for his own best interest and will never elevate you if he can knock you down a peg. Ms. Parenti was firmly in his crosshairs; she just did not know it yet.

Belligerent, Threatening, and Misogynist: A Most Apt Intern.

92.     In December 2018, Mr. Lanusse and Mr. Jones decided to sign the Design Department up to participate in the company internship program. They made their decision late in the process and assigned Ms. Parenti to find an intern for graphics and color. She could not find anyone qualified. Mr. Jones instructed Ms. Parenti to hire someone and without further delay.

93.     On her last day of searching, she found someone who was marginally qualified. Tyler Zugar, age 30, had managed his own sign painting company. His portfolio demonstrated knowledge of automotive paint and typography. He had only gone to trade school, but did not have a degree in design, which had always been a minimum requirement for the department. Still, they were just about to start a project painting roughly 200 paint samples to be sent to Specialized's factories for color matching, and she hoped Mr. Zugar could assist with this. Mr.

Jones and HR reviewed his portfolio and resume, and authorized Ms. Parenti to hire him. She was tasked with managing him, as well.

94.     It was the worst hiring decision she ever made. Mr. Zugar was angry, pushy, passive-aggressive, and sometimes straight up aggressive. He was older than most interns and older than the female graphic designers for whom he was hired to work. He apparently took umbrage at these more experienced women treating him as a subordinate. Whenever he was given an assignment by a female designer, he would check with male managers before performing it. The intern spoke in an aggressive manner to Ms. Parenti and female teammates.

95.     One morning, during a company meeting to which company interns were not invited due to the sensitive information under discussion, Mr. Zugar tried to enter the meeting, ostensibly for free coffee. He knew this was an important meeting because the design staff was in a frenzy for days preparing for the meeting. Janet Brazil, part of the events team, stopped him from entering, saying, "This meeting is for employees only." He tried to enter anyway. She physically blocked his entry, saying, "I'm not kidding."

96.     When he stomped into the department, his fists were clenched, his face stormy, and he body language aggressive. Ms. Parenti said, "Good morning," and he did not respond. After a few minutes, he came to speak with Ms. Parenti about the morning's activities and his frustration. Referring to Ms. Brazil, he said, "Next time I see her in the cafeteria I'm going to smash her coffee out of her hand." Ms. Parenti responded, "I would not recommend that action." she had to report his hostility to HR.

97.     Another day, Ms. Parenti was in a closed-door meeting with Mr. Jones, Ms. Clarot, and Mary Tolosa (Ms. Parenti's subordinate). Mr. Zugar opened the door and said, "Mind if I join?" Ms. Parenti responded we would be finished momentarily, and his presence at the

31

meeting was not necessary. He gave Ms. Parenti a dirty look and stomped off. Later, he complained to Ms. Parenti and Mr. Jones that he could not understand why he could not be in the meeting. He refused to accept from Ms. Parenti that any valid reason could exist for his omission from the meeting. He accepted that information from Mr. Jones.

98.     In March 2019, Ms. Parenti gave her 2021 Color Direction presentation. This is the meeting where she presented the color palette, paint samples, and her inspirations, to the executives to begin the process of getting the global market leaders on board with the design department plans. This information shared in this meeting is highly confidential because it would be extremely valuable to competitors. Accordingly, the meeting is invitation-only and limited to executives, the graphics team, and others with a need-to-know.

99.     The design department held the presentation in the R&D lab, outside of the paint booth. A few days earlier, she instructed Mr. Zugar to be finished painting and cleaned up around lunch time so she could set up the presentation. The morning of the presentation, he came up to Ms. Parenti in the cafeteria, and said, "After I went home and thought about it, I decided I should be there," i.e., in the highly-confidential meeting. Ms. Parenti explained to him that as an intern he was not privy to discussions about the company's future plans, products, and financials, even though he helped prepare the paint samples. He came in so close that she had to step back to maintain some semblance of personal space – he was using his size to try to intimidate Ms. Parenti. He argued that he "could just quietly stand in the background or serve drinks." He would not take no for an answer and did not seem to understand how thoroughly insubordinate he was being. Yet again, she reported his behavior to team manager Greg Black, Mr. Jones, and HR again.

100.     At lunch time, instead of having finished cleaning up so she could begin setting

up, Ms. Parenti found that Mr. Zugar had only just begun to set up his painting for the day. She did not wish to have another confrontation with Mr. Zugar that day. One of her male colleagues was working in the painting booth, so she asked him to make sure that he was finished and the area was clean before her presentation, and to remind Mr. Zugar to do the same. He agreed to help. Mr. Zugar listened to her male colleague. Afterwards, she sent Mr. Zugar home early for the weekend to give herself some time to decompress before presenting.

101.    Women on the team told Ms. Parenti they were fearful of Mr. Zugar, and if they saw him in the hallway they would go another direction. Ms. Clarot told Ms. Parenti that she no longer felt safe working late because Mr. Zugar would just appear when she worked late, and not speak to her. Ms. Parenti started closing her blinds at home for fear he might stalk her.

102.    Ms. Parenti was happy to bid farewell to Mr. Zugar at the end of the three-month internship. They had many male and female interns during her time at Specialized, all having the same limitations on access to confidential information, but she never had an intern as hostile and uncooperative as Mr. Zugar. Ms. Parenti spoke with her HR representative, Dan Kwong, frequently, seeking guidance on how to handle Mr. Zugar's lack of professionalism and hostility. Ms. Parenti sought Mr. Kwong's advice on how to speak with Mr. Zugar to help him get the most out of the internship and how to discuss how his behavior is perceived by the team, hoping to correct the behaviors. Ms. Parenti discussed the problems with Mr. Jones in their weekly calls, seeking his support and keeping him in the loop of what she was experiencing.

103.    As terrible as Mr. Zugar was with women, he was cloying and obsequious to senior executives Robert Egger and Rodney Hines, both of whom had been with Specialized for more than 30 years. He offered himself for any task they could possibly need, such as printing vinyl signs, or painting signs, for Specialized's presence at the Sea Otter Classic, an annual

cycling festival in Monterey, California. In a few short weeks, he managed to ingratiate himself to these influential long-time employees.

<u>Retaliation for Opposing Gender-Based Hostile Work Environment</u>.

104.    In Spring 2019, shortly after the internship ended, Mr. Egger stopped Ms. Parenti in the hall to ask about the plan for Mr. Zugar's future. Ms. Parenti informed him that there is no plan due to his performance and attitude. He responded, "That is a shame," then asked, "What are we going to do about that?" Ms. Parenti replied, "Nothing. He has a record in HR."

105.    Soon thereafter, she was called into an impromptu meeting with both Mr. Egger and Mr. Hines. They questioned Ms. Parenti as to why she was not bringing Mr. Zugar back for a regular full-time position. She told them, <u>again</u>, about his terrible attitude, especially towards the women on her team. She recited the litany of his misdeeds, and told them she documented his aggressive behavior, threats, and frustrations, and reported them to HR. She made particular note of his aggression toward Ms. Parenti and Ms. Brazil, his refusal to take direction from women, and general hostility toward women. She explained that she could not hire him even if she wanted to, which she did not. They responded that they would "speak with Mike [Sinyard] about this."

106.    When she returned to her desk, she said to Ms. Clarot, "Well that's it for me. I went against them. I will be next on the chopping block." Messrs Eggers and Hines had a direct line to Mr. Sinyard and every time one of them wanted something done, they would each just say, "This is what Mike wants," and it would be done.

107.    On Monday, May 6, 2019, Ms. Parenti received an email from Dan Kwong. Messrs. Hines and Egger did "speak with Mike," and then went straight into HR. The email said:

> Hey Team, Just a quick follow up, she reconnected with Rodney [Hines] and Robert [Egger] regarding extending Tyler's internship.

> It was a difficult conversation because they felt like there was
> conflicting information/feedback. I shared some of the feedback
> from the team and offered reasons why we felt Tyler wasn't the
> right person to do this from a personality/behavior perspective, not
> so much technical skills. Ultimately the point I made was that the
> team felt uncomfortable around Tyler (which connected to some of
> the past situations around his behavior). Their bigger concern is
> finding someone to help with the workload. A heads up, they'll be
> expecting support from the team with some of the painting until a
> more long-term solution is found.

In short, because she did not let Messrs. Egger and Hines have their way, they would expect

from the design department the level of obsequiousness and cloying humility as they enjoyed

with Mr. Zugar. Not wanting his team tied up with extra tasks unrelated to its own work, Mr.

Jones replied:

> Hi Dan,
>
> Thanks for the heads up and taking on this challenging
> conversation. I am not sure what they mean by "They'll be
> expecting support" as we do what we can do, but none of us report
> to them. If our regular work requires greater attention, they will
> have to be patient or manage it on their own.

108.    In July 2019, only a month later, Specialized terminated Mr. Kwong. Ms. Parenti

was shocked. Mr. Kwong was highly professional and gave Ms. Parenti the best coaching

through her issues with the intern. In a conversation with another HR representative, Cindy

Ripley, she asked why he was terminated, noting that, "He seemed highly professional and was

one of the best reps I had worked with." She responded, "Yeah, he was great, but you know how

this place is." Indeed, she did. Any check on the behaviors of senior executives, no matter how

justified, got you fired.

109.    Ms. Parenti experienced further retaliation for taking appropriate steps in response

to Mr. Zugar's unprofessional, sexist, and hostile behavior: Specialized denied Ms. Parenti a

bonus even though she helped the company hit 119% of its sales target – substantially more than

the company forecast.

110.   Ms. Parenti's performance review occurred in August 2019 and was conducted by Mr. Jones. He raised the situation with the intern and told Ms. Parenti that she needed to work on her conflict resolution. Ms. Parenti wholeheartedly disagreed. She handled the whole experience as professionally as anyone possibly could. She asked for guidance from her managers and HR, and followed through with their guidance. She did nothing that would elevate the conflict. During the 3 months of the internship, neither Mr. Jones nor HR suggested that she should have handled the situation differently. She had done everything that was asked of her except find a way to offer a full-time position to someone who was ill-qualified, hostile, aggressive, intimidating, and resented women in positions of power.

111.   Ms. Parenti's performance was graded as a 3 of 5, the same as the previous year. In the previous year, she received her full bonus, plus an additional $4,000 for her initiative. Every other year, she received her maximum target bonus. Her target bonus for 2019 was supposed to be $15,000.

112.   In mid-August 2019, Mr. Jones surprised Ms. Parenti in a weekly one-on-one meeting with the information that she was not receiving a bonus and she was not getting a raise. He tried to tell Ms. Parenti how hard of a conversation it was for him. Ms. Parent became upset and hung up on him. She thought she was going to have a panic attack; she could not understand how Specialized could assess her contribution to exceeding their sales goal by about 19%, and conclude that she deserved nothing. She went to her desk and packed all her belongings to leave.

113.   To make matters worse, Mr. Jones called or texted everyone in her group, telling them to leave Ms. Parenti alone. He explained to her entire department that she did not receive a bonus and, naturally, how "hard it was" for him to tell Ms. Parenti. He told the team to "rally

together for lunch and drinks and take the day off if needed." He never told them to rally around Ms. Parenti and show Ms. Parenti support as a valued member of our team. Clearly, he and the team were the aggrieved parties.

114.    Critically, Specialized granted her subordinate, Mary Tolosa, her full bonus <u>and</u> extra bonus. She had only been with the team for six months and everything Ms. Tolosa did was with the help and coaching of Ms. Parenti. In the past when she had direct reports, she would meet with her manager and discuss the merit/bonus allocation. In 2019, Mr. Jones decided how her direct report performed and dictated what to put into the performance evaluation system.

115.    The following Monday, Ms. Parenti decided to apologize for getting so upset. She scheduled a meeting on August 26th with Eric Edgecumbe to discuss the situation and gain better understanding of why she was denied her bonus. Mr. Edgecumbe told Ms. Parenti that when Mr. Jones told him she was not getting a bonus, he "knew it would not go well."

116.    Mr. Edgecumbe asked Ms. Parenti to set up time to discuss the situation with himself and Mr. Jones. He also requested that she put together a list of what she understood to be her accomplishments and shortcomings, and send it to Mr. Jones before the meeting. Ms. Parenti asked if Mr. Jones would be preparing something similar. Mr. Edgecumbe said no, but "we would have a good discussion." She was dubious – how could we have a "good discussion" if she was the only one giving any thought to the subject matter. At the end of our discussion, she asked about her compensation. Mr. Edgecumbe responded that compensation "isn't part of this meeting." The Old Boys Network might indulge Ms. Parenti with a discussion, but did not care to correct retaliatory behavior.

117.    In October 2019, Ms. Parenti received a small bonus for her work on color communication and displays for Specialized's global Merchandised Line Validation meeting,

where company leaders decide which potential products they are going to continue developing and which they are going to abandon. She did this work every year even thought it was not part of her job description. She received $3,000 – a mere 20% of her target bonus for 2019.

Mr. Jones, Sexual Objectification, Misogyny, and Male Aggrievement.

118.     In the last 6 months of her employment with Specialized, Ms. Parenti's department set out to hire a new, entry level graphic designer. They were extremely short-staffed and looking for someone "moldable and eager." Ms. Clarot and others reviewed the resumes and interviewed candidates. When they narrowed the field down to two candidates (one male and one female), Ms. Clarot told Ms. Parenti about them. She said they were both well-qualified, but the male was more focused on 3D rendering and the female more hands-on painting and experimental experience. Since they needed a creative graphic designer, Ms. Clarot favored the female candidate for her creativity. When Ms. Parenti discussed the hiring options with Mr. Jones, he dismissed Ms. Clarot's reasoned analysis and stated, "Of course, she wants to hire the female." It seemed impossible for Mr. Jones to accept that the female candidate was best suited for the role and that Ms. Clarot based her recommendation on objective facts rather than the candidates' genders.

119.     Mr. Jones frequently commented that the physical appearance of the women in their department. Ms. Clarot, for example, was set to be married in October 2019. In the weeks leading up to her marriage, she had false eyelashes and hair extensions professionally applied. Mr. Jones could not stop himself from making inappropriate comments about Ms. Clarot's hair and makeup every time she spoke in a meeting, which was just about every day. In one instance, he asked if she was able to see clearly, suggesting that the false eyelashes somehow interfered with her vision. Ms. Clarot tried to brush off Mr. Jones' comments, but she became increasingly

frustrated by them. It reached a point where Ms. Clarot would just stop speaking and stare straight ahead, waiting for Mr. Jones to stop his comments before proceeding.

120.    In one of the last meetings Ms. Parenti attended with the team, Mr. Jones asked their new, young graphic designer, Elena Aker, what kind of music she likes. Before she could respond, Mr. Jones told the team that he imagined Ms. Aker loving heavy metal (his favorite genre), and "going to raves dressed in furry pink pants." Ms. Aker responded, "I actually do not like metal at all," displaying the cool disinterest Mr. Jones' objectifying comment deserved. It was an extremely awkward moment. It is extremely inappropriate for a manager to think about a junior staffer in such a belittling manner, much less to share his thoughts to his team. Ms. Aker is a professional graphic designer, not a fetish doll. After the meeting, Ms. Clarot sent Ms. Parenti a text expressing how bad she felt that she was unable to protect Ms. Aker from Mr. Jones' outrageous conduct.

121.    Objectification of female employees hardly started with Mr. Jones. It flowed from the top down. It was not long before company founder Michael Sinyard noticed Ms. Clarot's work and Ms. Clarot. By 2017, she was the only female graphic designer and Mr. Sinyard's wanted Ms. Clarot to design just about everything. Consequently, Ms. Clarot was assigned to design projects far outside the scope of her job, such as designing the Specialized team bike and a line of t-shirts.

122.    Mr. Jones used Mr. Sinyard's infatuation with Ms. Clarot to ingratiate himself to Mr. Sinyard. In August 2019, Mr. Sinyard asked Mr. Jones for Ms. Clarot's confidential employee data – her personal contact information – so he could invite her to attend the Burning Man Festival with him in August-September 2019. Mr. Jones was happy to oblige, and septuagenarian Mr. Sinyard did indeed invite twenty-something Ms. Clarot to join him. She

demurred: Ms. Clarot is a professional graphic designer, not a sex toy for the Old Boys at Specialized.

123.    Burning Man was not a work activity and, as Mr. Jones well knew, Ms. Clarot was engaged to be married in October 2019. On information and belief, Mr. Sinyard knew she was getting married. If this were a work activity, the company founder would not be the person asking a front line professional to attend, and whoever had that responsibility would have contacted her through company resources. On information and belief, the company did not have any business activities at the festival.

124.    In November 2019, Ms. Parenti attended the Specialty Equipment Market Association ("SEMA") trade show in Las Vegas with Mr. Jones and others from her department. SEMA is the largest automotive trade shows in the world. Mr. Jones invited a former Specialized employee who left to start a custom painting business to one of the team dinners. Ms. Parenti had worked with him and his partner in the past. She sat next to their guest (who also brought along his father) and, naturally, they talked about the industry and life in their business.

125.    Through dinner she could see and feel Mr. Jones staring at her. After the dinner, Mr. Jones commented that she seemed to be rapt by our guest's "dreamy blue eyes." She replied that it was nice to catch up with an old acquaintance. Back at the hotel she learned later that Mr. Jones had commented to Ms. Clarot that it was "cute" how she was learning to build a business. By this time, Mr. Jones had already taken credit for her paint application innovations, denied Ms. Parenti the bonus she earned, humiliated Ms. Parenti in front of the team by telling them that he denied Ms. Parenti the bonus she earned, and made a joke of her personal life with Mr. Browning. It is only natural that he would cast aspersions on her talking to a former colleague.

126.    In 2018, she attended SEMA with Mr. Jones, Mr. Lanusse (her manager at the

time), Mr. Egger, and another colleague. Mr. Jones took this opportunity to denigrate Ms. Parenti in front of our senior leaders by implied slut-shaming. After imbibing an extra-large margarita, Mr. Jones began reminiscing about days at Cannondale, and what it was like when he worked there. He said that everyone at Cannondale slept around with each other and, looking at Ms. Parenti, said, "Right, Lauren?" The implication was clear: he was insinuating that she slept around at Cannondale, and doing so to her boss and other senior managers at Specialized. She was mortified. She had no interest in Mr. Jones' sexual activities at Cannondale (other than feeling disgust that he declared they would sleep together on a business trip), but she did not sleep around at Cannondale and it would not be his or Specialized's business even if she had. Ms. Parenti met her life partner, Mr. Browning, at Cannondale. Mr. Jones was playing his game of belittling and objectifying Ms. Parenti to ingratiate himself with the Old Boys Network while putting her down.

127.    Mr. Jones apparently struggled with what were appropriate topics of discussion for work and she often marveled at why, when he went out of his way to undermine and diminish her stature within Specialized, he would burden Ms. Parenti with complaints about his life or think she had a sympathetic ear to lend. Of course, the person who sought sympathy because it was hard for him to deny Ms. Parenti the bonus and merit increase she earned for her work in model year 2019 might miss that subtlety. In June 2019, while traveling to Spain for a color and graphics presentation, Mr. Jones complained incessantly about his life: working at home was uninspiring, he had no money, he loved to travel but his wife would hate to live anywhere else, his wife made him get rid of his Jeep, his wife wanted a larger car with various bells and whistles because she wanted to fit her mother in with the family. He also complained that his wife was not a "natural mother" (whatever that is) and found motherhood extremely challenging. It was

bad enough being forced to listen to his wailing and gnashing of teeth, but disgusting to hear how

he viewed his wife. She was apparently supposed to fit some model of womanhood that had

nothing to do with who she is, and everything to do with some fantasy in his head. His wife was

just another fetish doll to him, and one that was not serving his best interest.

<u>Evaluating Her Worth to Specialized and Moving Back East.</u>

128.    Already disenchanted with the management and gender bias she had been

experiencing for years, especially when she did not receive bonus or merit increase in 2019, Ms.

Parenti had to reevaluate her value at Specialized. In November 2019, Mr. Browning and she

decided it was time move back to Connecticut to be closer to her family. She thought Specialized

would be amenable to her working remotely, as Mr. Jones lives and works in a town close

roughly 20 minutes from where they planned to live, and two other male employees worked

remotely. Specialized, however, was inconsistent and highly changeable when it came to her

continued employment.

129.    In November 2019, Ms. Parenti organized a meeting with Mr. Jones and Mr.

Edgecumbe to discuss her future. When she told them of her plans to leave, Mr. Edgecumbe

jumped in before Mr. Jones could comment and said, "I'm going to speak openly. Lauren,

Specialized would not like to lose you." He asked how she wanted this to go. She stated that she

loved her job working on color and she would like to work remotely. Messrs. Jones and

Edgecumbe agreed and told Ms. Parenti to put together a proposal for her working remotely.

130.    Ms. Parenti had a target on her back with Mr. Jones since the Olympic products

debacle in early 2019, so she was not surprised when Mr. Jones called Ms. Parenti a week later

to say that Specialized did not think she could perform her job remotely. He suggested that she

try to work something out with the merchandising team. He did not explain why Specialized

thought she could not perform her job remotely but had no problem with Mr. Jones and two other men doing so.

131.    Mr. Jones offered Ms. Parenti a 40-day transition period, during which she could complete the global color palette for the 2022 model year. Ms. Parenti accepted the offer to stay on for the 40 days, beginning after the holidays and her relocation. Eventually, Specialized approved her request to work remotely full time, but only after setting aggressive new milestones for Ms. Parenti to reach to prove that she could work remotely. She met each milestone up to the date her employment was terminated.

132.    Right after the first meeting about her relocation, Mr. Jones started asking a lot of questions about our plans, like where would she be living, and did she and Mr. Browning rent or buy? He asked for her new home address so he could Google it on the spot. She told him she did not wish to share her personal and financial information with him at the time. Mr. Jones became offended and told Ms. Parenti it was "weird." He continued asking for her new home address for weeks. After her many refusals, Mr. Jones grew frustrated and said she would need to change it for tax purposes, and he would see it in Specialized's HRIS system.

133.    Mr. Jones already abused his access to the HRIS system by giving Ms. Clarot's personal contact information to Mike Sinyard, and Ms. Parenti did not want Mr. Jones or Specialized making decisions about her employment based on whatever conclusions they drew about her finances from her new home address. Ms. Parenti went to Ms. Ripley in HR find out if she could manage access to her personal employment data. Coincidentally, California just passed a new law requiring companies to keep employment data confidential, so she was able to block Mr. Jones' access to her new address. When he could not get the information from the HRIS system, Mr. Jones began fishing for information through Ms. Clarot. He asked if Mr. Browning

and she were still a couple. Ms. Clarot told Ms. Parenti that she refused to discuss Ms. Parenti's

personal life with Mr. Jones.

134.    Ms. Parenti and Mr. Browning moved back to Connecticut in December 2019.

She took a few weeks off to settle in and returned to work in January 2020. On information and

belief, the company gave employees a few weeks off to settle when they moved long distances,

like to Asia. In the first week of February, Mr. Jones and Ms. Marusarz of HR informed Ms.

Parenti that they were reducing her salary due to cost of living adjustments in her new location.

They did not give Ms. Parenti any benchmarking data to show that western Connecticut had a

lower cost of living than Santa Clara County, California. Mr. Jones did not explain why it was

fair for Ms. Parenti to have a downward cost of living adjustment for moving back east, when his

salary was not adjusted when he moved 20 minutes away. They just imposed the new, lower

salary. Specialized attempted to reduce her product bonus as well, but she convinced them to

keep it at the pre-move level, arguing that her working in Connecticut would not change her

work ethic or potential to do great things for the company. She convinced them that lowering her

bonus would be disincentivizing.

135.    On April 21, 2020, she was informed that she was being laid off as of April 23,

2020. According to Specialized, the reason for the layoff was "declining business and unforeseen

circumstances related to and caused by the COVID-19 pandemic and orders issued by

government authorities restricting certain business activities." Ms. Parenti, however, thinks the

layoff was opportunistic. Specialized saw a chance to lower its overhead at a time when their

doing so would be overlooked. Whatever "declining business" Specialized suffered was quickly

abated when people started being able to leave their homes again. News articles abound with the

boom in the cycling industry caused by COVID and how impossible it has been since May to

find a bicycle to buy.

136.     Adding insult to injury, Mike Sinyard insinuated that those affected by the layoff were dead weight. In an interview with a trade publication, he said, "Regrettably, some of the people we had, who've done a fine job for us, we don't need; we have to make room for new people. I know that sounds harsh, but that's the way it is." Those are not the words of someone making a tough business decision in an economic downturn. The decision to terminate Ms. Parenti was pretextual or false.

137.     Ms. Parenti had a meeting with Mr. Jones and Erin Garcia of HR via Zoom to discuss her layoff. They asked Ms. Parenti if she had any questions and she asked them why she was being laid off. She stated, "I have proven myself, met all my goals and worked so hard." Mr. Jones responded, "Yes you did." This was an admission of fact that Ms. Parenti's performance was not the basis for her termination. None of her contributions mattered. Mr. Jones decided to get rid of Ms. Parenti after the Olympic planning team adopted her color story over his idea. Her much-lauded Color Run innovation for the 300 was just another nail in her coffin. Just as he was going to protect himself and not bother hiring a creative director, he was going to protect himself by getting rid of Ms. Parenti. She challenged his idea about what women could do and his vision for women in the cycling industry.

138.     Based on her experience working for Specialized, with its culture of tolerating gender bias, creating double standards, claiming credit for women's innovations, unwelcome sexual overtures, objectifying women, and consistent "othering" of women in cycling and in its employ, she asserts her gender played a substantial role in the decisions to withhold her bonus last year, reduce her salary, and terminate her employment shortly after getting from Ms. Parenti the global color palette that will set them up through model year 2022. The sexist and

misogynistic behavior was frequent and pervasive, creating a hostile work environment for women at Specialized, including Ms. Parenti.

## FIRST COUNT:

### DECLARATORY JUDGMENT THAT PLAINTIFF'S PURPORTED ARBITRATION AGREEMENT IS UNENFORCEABLE

139.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 138 as if fully set forth herein.

140.    A justiciable case or controversy exists between the parties concerning the enforceability of the Arbitration Agreement in the adjudication of Plaintiff's claims.

141.    The Arbitration Agreement, drafted by Defendant and non-negotiable by the parties, failed to provide and set forth in a conspicuous manner a valid jury waiver. In fact, the Arbitration Agreement contains no jury waiver language; no hint or suggestion that Ms. Parenti would be waiving her Seventh Amendment right to trial by jury. Ms. Parenti had no opportunity to discuss the Arbitration Agreement with counsel. She had no intent to waive her right to trial by jury and was unaware that by signing the Arbitration Agreement, she was waiving her right to a trial by jury.

142.    There is an actual, bona fide, and substantial question or issue in dispute or substantial uncertainty of legal relations between the parties which requires the Court's intervention.

143.    Ms. Parenti seeks declaratory judgment pursuant to Fed. R. Civ. Pro. 57 and 28 U.S.C.§ 2201, as she has legal and equitable interest by reason of Defendant's threat of enforcing the Arbitration Agreement.

144.    The purported arbitration agreement is void due to unconscionability. A substantial disparity in bargaining power existed between the parties. Ms. Parenti was handed the

Arbitration Agreement in the morning on her first day of work for Specialized and told she had to sign it to work there, after moving cross-country for the job. She was not afforded any opportunity to consult with counsel in negotiating her agreement. There was no mutual manifestation of the terms of the Arbitration Agreement between the parties.

145.    The purported Arbitration Agreement is void because Defendant failed to put Ms. Parenti on notice of her waiver to a jury trial. The Constitution of Connecticut, Article First, § 19, provides that "[t]he right of trial by jury shall remain inviolate." There is absolutely no evidence to show that Ms. Parenti made a voluntary or knowing waiver of her Seventh Amendment right. The vague acknowledgement that arbitration "represents an alternative to jury trial" buried in the third paragraph, several lines from the bottom of the page, does not imply a jury waiver.

146.    Ms. Parenti respectfully requests a declaration that the Arbitration Agreement is void and unenforceable as a matter of law.

### SECOND COUNT:

### SEX DISCRIMINATION UNDER TITLE VII:
### HOSTILE WORK ENVIRONMENT

147.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 146 as if fully set forth herein.

148.    Ms. Parenti is a member of a protected class under Title VII because of her gender (female). She specifically incorporates by reference her Title VII claims in the Fifth and Seventh Counts, herein.

149.    Ms. Parenti endured sexual harassment in the form of a hostile work environment at Specialized. Women at Specialized, including Ms. Parenti, were exposed to disadvantageous terms and conditions of their employment to which men were not exposed.

150.    Sexual harassment at Specialized was severe and pervasive, and created an environment that a reasonable person would find hostile or abusive. Ms. Parenti subjectively found the environment hostile and abusive. For example:

(a) Her initial manager, Alain Lanusse, harassed her for becoming pregnant, forced her to reveal her personal health information where she preferred not to, and shared in the widely-held belief that working mothers are ineffective. He laid off her entire staff two days into her maternity leave and treated her like persona non grata when she returned from leave. Specialized placed its own institutional barriers to mothers returning to work, by placing the "Mother's Room" in a far-off maintenance closet that guaranteed the maximum disruption of a woman's work day if she had the audacity both to breed and breastfeed her infant.

(b) Both Mr. Lanusse and her most recent manager, Ron Jones, openly resented Ms. Parenti for creating successful designs and colorways, and fought against the adoption of her well-received work. Working under Mr. Lanusse, Ms. Parenti had to fight to have the Equality design for the Roubaix line put into production, and endured derision from men in Design, Product Management, and Marketing for suggesting that anyone cares about sexual assault. Even with the most potent proof of concept – sold-out models and sales representatives hungry for a sufficient number of Roubaix bikes with the Equality design to satisfy demand – Mr. Jones set out to kill the Equality design.

(c) From the reaction of Mr. Lanusse when the overwhelming popularity of Ms.

48

Parenti's design for Rhyme caused a redesign of Stumpjumper, one might have thought Ms. Parenti sought to color every bike pink and add a white plastic flower basket to the handlebars. Women did not work on men's bikes at Specialized until after 2017, when Michael Sinyard ended production of bikes engineered for women.

(d) Mr. Jones' tirade over her "Speed of Light" color and design for the 2020 Olympics bike, which marketing enthusiastically supported, underscores the petty irrationality of design department men when a woman at Specialized experienced a success that the man could not claim for himself. In more thoughtful moments, Mr. Jones and Mr. Lanusse simply took credit for the work of women in the design department. In this way, Ms. Clarot's Tarmac design became "Ron's new design," and the innovative reflective paint application developed by Ms. Parenti's partner, Jimmy Browning, and Ms. Clarot became a testament to Mr. Jones' creative innovation. Mr. Jones gleefully admitted that he basked in Mr. Sinyard's accolades for the "Color Run" paint application Ms. Parenti created, without sharing credit for her work.

151.  This is just the surface. Ms. Parenti and other women (Ms. Clarot, in particular), endured:

(e) Artwork that read "Jumping ruts and fucking sluts," created during working hours and presumably for Specialized, by a man whom Specialized rewarded with a promotion and a raise;

(f) An intern who would not take instruction from women, threatened physical

49

violence against women, made women feel uncomfortable when they worked late and he was there, and who used intimidation to try to gain entrance to meetings he was not authorized to attend where trade secrets were discussed. Ms. Parenti was yoked with managing him. Despite his having been an objectively terrible employee, Ms. Parenti was punished in her annual review and denied both a raise and her bonus because the intern had ingratiated himself to senior executives and her reports to human resources concerning the intern prevented the senior executives from securing a full-time job for the intern.

(g) Vile and obnoxious comments about their physical appearance, uttered by European business leaders while the women were giving presentations;

(h) Being surreptitiously photographed by European business leaders;

(i) Being treated as commodities to be collected or traded like favors, such as when Mr. Jones thought it wise and appropriate to share 20-something Ms. Clarot's personal contact information with septuagenarian Mr. Sinyard, so Mr. Sinyard could invite her to attend the Burning Man Festival with him. This was not a business trip. As of January 1, 2020, this disclosure of employee data is unlawful pursuant to the California Invasion of Privacy Act.

(j) Being treated as sex objects, such as when Mr. Jones described his imaginings about new, young graphic designer Elena Aker, attending raves wearing "furry pink pants."

(k) The treatment of women as sex objects, such as when Mr. Jones impliedly slut-shamed Ms. Parenti when he regaled the team with stories of when he and

Ms. Parenti both worked for Cycle Sports Group, Inc. where, he claims, everyone slept around with each other. (Notably, Mr. Jones' sexual designs on Ms. Parenti when they both worked for Cycle Sports Group, Inc. were unsuccessful.)

(l) Assumptions that their designs and colorways were not practicable, even though Ms. Parenti always conferred with the factories to confirm their capabilities before presenting new ideas.

(m) Being shut out of meetings relevant to her job duties.

152.    The workplace at Specialized was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to adversely and permanently alter the terms, conditions and privileges of Ms. Parenti employment in comparison to similarly situated male employees.

153.    Ms. Parenti reported the abusive and oppressive behavior to HR. Too often, Specialized's response was fire the HR rep to whom Ms. Parenti reported. In any event, nothing changed. On information and belief, no internal investigations were ever performed in response to Ms. Parenti's, and other female employee's, complaints of sexual harassment or gender discrimination.  Ms. Parenti witnessed that people who made good faith complaints about abusive male managers became targets for further harassment by those male managers.

154.    As a result of the hostile work environment at Specialized, Ms. Parenti has suffered damages.

## THIRD COUNT:

## SEX DISCRIMINATION UNDER CaFEHA
## HOSTILE WORK ENVIRONMENT

155.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through

153 as if fully set forth herein.

156.    Ms. Parenti is member of a protected class under CaFEHA because of her gender (female). She specifically incorporates by reference her Title VII claims in the Second, Fifth, and Seventh Counts, herein.

157.    As a result of the hostile work environment at Specialized, Ms. Parenti has suffered damages.

## FOURTH COUNT:

### SEX DISCRIMINATION UNDER CtFEPA
### HOSTILE WORK ENVIRONMENT

158.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 157 as if fully set forth herein.

159.    Ms. Parenti is member of a protected class under CtFEPA because of her gender (female). She specifically repeats and incorporates by reference her Title VII claims in the Second, Fifth, and Seventh Counts, herein.

160.    As a result of the hostile work environment at Specialized, Ms. Parenti has suffered damages.

## FIFTH COUNT:

### SEX DISCRIMINATION UNDER TITLE VII
### DISPARATE TREATMENT – TERMINATION OF EMPLOYMENT

161.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 160 as if fully set forth herein.

162.    Ms. Parenti is a member of a protected class under Title VII because of her gender (female).

163.    Ms. Parenti was at all times qualified for her position as Head of Color. She

originated the role, her innovative application techniques and colorways were lauded within Specialized and by the industry. She was initially tasked with developing color for women's products, and her role expanded to include all Specialized products. Indeed, as much as Mr. Jones sought to terminate her employment once she relocated to Connecticut, he proposed that she stay around long enough to complete the color palette for the 2022 model year.

164.    Mr. Jones' own misogyny demonstrates that Ms. Parenti's gender was a motivating factor in selecting her for termination. He resented that she is more talented and has a better grasp of what is necessary to appeal to new customers. He tried to get her to quit by withholding a well-earned pay raise and bonus. He tried, but was unsuccessful, in getting rid of her when she requested to work remotely from Connecticut. Her star continued to rise from Connecticut when Color Run was presented to the global leaders. He could not abide working for women or having a woman show him up. Thus, he did what was necessary to add her to the layoff list in April 2020.

165.    Specialized cannot rely upon its reduction in force as a nondiscriminatory reason to terminate Ms. Parenti's employment. Ms. Parenti's duties were not eliminated. Specialized will continue to need someone knowledgeable about color to select colors for their products. Ms. Parenti's gender was a substantial and motivating factor in why she was chosen for layoff.

166.    As a result of Specialized's sex discrimination, Ms. Parenti has suffered damages.

**SIXTH COUNT:**

**SEX DISCRIMINATION UNDER CtFEPA**
**DISPARATE TREATMENT – TERMINATION OF EMPLOYMENT**

167.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 160 as if fully set forth herein.

168.    Ms. Parenti is a member of a protected class under CtFEPA because of her gender

53

(female). Ms. Parenti specifically repeats and incorporates in their entirety allegations set forth in Counts Two, Five and Seven.

169. As a result of Specialized's sex discrimination, Ms. Parenti has suffered damages.

**SEVENTH COUNT:**

**SEX DISCRIMINATION UNDER TITLE VII**
**DISPARATE TREATMENT – SALARY REDUCTION**

170. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 169 as if fully set forth herein.

171. Ms. Parenti is a member of a protected class under Title VII because of her gender (female).

172. Ms. Parenti was at all times qualified for her position as Head of Color. She originated the role, her innovative application techniques and colorways were lauded within Specialized and by the industry. She was initially tasked with developing color for women's products, and her role expanded to include all Specialized products.

173. In December 2019, Ms. Parenti moved to a town in Litchfield County, Connecticut, and reached an agreement with Specialized to work remotely. A few years earlier, Ron Jones, who had not yet been promoted to Head of Design, moved to a different town in Litchfield County, Connecticut, located about 20 minutes away from where Ms. Parenti moved, to work remotely. Specialized said something about reducing his salary because it believed Litchfield County, Connecticut had a lower cost of living than Santa Clara County, California. However, as Mr. Jones intimated to Ms. Parenti, Specialized did not reduce his salary

174. Specialized discriminated against Ms. Parenti in the terms, conditions, and privileges of her employment when it reduced her salary. This adverse employment action occurred under the following situation giving rise to the inference of discrimination: Ron Jones,

54

a male with a nearly-identical relocation and remote work arrangement was treated more favorably than Ms. Parenti.

175.     As a result of Specialized's sex discrimination, Ms. Parenti has suffered damages.

## EIGHTH COUNT:

### SEX DISCRIMINATION UNDER CtFEPA
### DISPARATE TREATMENT – SALARY REDUCTION

176.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 175 as if fully set forth herein.

177.     Ms. Parenti is a member of a protected class under CtFEPA because of her gender (female). Ms. Parenti specifically alleges and incorporates her allegations in Count Seven.

178.     As a result of Specialized's sex discrimination, Ms. Parenti has suffered damages.

## NINTH COUNT:

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

179.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 175 as if fully set forth herein.

180.     Specialized was fully aware of the extreme, inappropriate, offensive, and hostile working environment that Ms. Parenti was subjected to every day and allowed it to continue for years, despite her repeated reporting of such conduct. Notwithstanding that, Specialized terminated her employment, blaming the pandemic and implying that those selected for layoff were dead wood. In an interview with Bicycle Retailer and Industry News, and in a letter to dealers, Michael Sinyard stated, "We're doing everything we can to retain our top talent," but Specialized was laying off employees "we don't need … to make room for new people. I know that sounds harsh, but that's the way it is." https://www.bicycleretailer.com/industry-news/2020/04/23/specialized-lays-46-employees-mostly-its-global-support-

staff#.X0gzw8hKiUk, last accessed August 27, 2020. Thus, at the height of the COVID-19 pandemic in California and Connecticut – at a time when Ms. Parenti would have the most difficulty finding alternate employment – Specialized further undermined her ability to find a job by declaring that she is not top talent, was not needed, and they got rid of her to make room for someone competent.

181.    Specialized knew or should have known that emotional distress was the likely result of enduring years of sexual harassment at work with no hope of reprieve. Specialized knew or should have known that emotional distress was the likely result of Mr. Sinyard's statements. They were completely unnecessary and obviously designed to make himself and Specialized look good. Nevertheless, insulting former employees and making it more difficult for them to find alternate work in the midst of a pandemic, for your own aggrandizement, is extreme and outrageous. Similarly, knowingly permitting your female employees to be objectified, ridiculed, undermined, and harassed on a daily basis is extreme and outrageous.

182.    Ms. Parenti has suffered severe emotional distress from the hostile work environment she endured as a female Specialized employee; as well as the unwarranted and untrue hit to her professional reputation, and uncertainty from being unemployed, when she ceased being a Specialized employee.

183.    As a result of Specialized's intentional infliction of emotional distress, Ms. Parenti has suffered damages.

**TENTH COUNT:**

**<u>NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>**

184.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 183 as if fully set forth herein.

185.     Specialized's conduct in perpetuating a sexually hostile work environment, insulting her competence, and making it more difficult for her to find new employment after terminating her in the midst of a pandemic created an unreasonable risk of causing Ms. Parenti emotional distress.

186.     Ms. Parenti's emotional distress was entirely foreseeable and severe enough that it might result in illness or bodily harm.

187.     Specialized's conduct caused the emotional distress Ms. Parenti suffered.

188.     As a result of Specialized's negligent infliction of emotional distress, Ms. Parenti suffered damages.

## ELEVENTH COUNT:

## DEFAMATION PER SE

189.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 188 as if fully set forth herein.

190.     Specialized defamed Ms. Parenti when Michael Sinyard stated as fact, in a letter published to dealers and in an interview with Bicycle Retailer and Industry News, "We're doing everything we can to retain our top talent… Regrettably, some of the people we had, who've done a fine job for us, we don't need; we have to make room for new people. I know that sounds harsh, but that's the way it is." https://www.bicycleretailer.com/industry-news/2020/04/23/specialized-lays-46-employees-mostly-its-global-support-staff#.X0gzw8hKiUk, last accessed August 27, 2020. The clear implication of Mr. Sinyard's statement is that those subject to layoff were not desirable as employees and were not competent.

191.     Mr. Sinyard's statement is false as to Ms. Parenti. Ms. Parenti's innovative application techniques and colorways were lauded within Specialized and by the industry. The

trade describes her last great contribution to the company – the Color Run process used on the recently-launched Aethos line of bikes as "stunning to behold. The Satin Carbon/Chameleon Red Gold finish is beautiful, with deep sparkly reds and purples pick up light and further reveal themselves as you look closer." https://www.cyclingnews.com/reviews/specialized-aethos-review/

192.    As Mr. Sinyard's false statement concerned Ms. Parenti's professional reputation, she need not demonstrate special damages. Nevertheless, Mr. Sinyard's statement has caused Ms. Parenti to suffer damages by interfering with her ability to find alternate employment.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

(a)  A declaration that the purported arbitration agreement is void and unenforceable;

(b)  Compensatory Damages;

(c)  Punitive Damages;

(d)  Costs;

(e)  Prejudgment interest;

(f)  Attorneys Fees'

(g)  Such other and further relief in law or equity as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury on all questions of fact raised by her Complaint.

Respectfully submitted,

LAUREN PARENTI

By:___/s/_____
    Mark P. Carey (ct17828)
    Frances Codd Slusarz (ct24442)
    Carey & Associates, P.C.
    71 Old Post Road, Suite 1
    Southport, CT 06890
    (203) 255-4150 tel.
    (203) 255-0380 fax
    mcarey@capclaw.com
    fslusarz@capclaw.com

    *Her Attorneys*